# CHARLESTON.

### FISHER *et als.* v. HARMAN *et als.*

### Decided April 26, 1910.

1. UNLAWFUL ENTRY AND DETAINER—*Summons.*
   The statute, section 1, chapter 89, Code 1906, provides for but one form of summons (declaration), and evidence of forcible entry by defendant, which is unlawful, is admissible thereunder, without specific allegation thereof.

2. SAME.
   Where in such action the defendant's entry was forcible it is unlawful regardless of the question of right.

3. SAME.
   A case in which the acts and conduct of defendant in making an entry on land, as proven on the trial, were held to constitute a forcible and unlawful entry entitling the plaintiff to recover.

Error to Circuit Court, McDowell County,

Action by Thomas Fisher *et als.* Verdict for defendants set aside and new trial awarded, to which judgment a writ of error was granted.

*Affirmed.*

*D. J. F. Strother, W. L. Taylor, Jas. A. Strother, E. C. Marshall* and *John A. Holt,* for plaintiffs in error.

*A. S. Higginbotham, Chapman & Gillespie,* for defendants in error.

MILLER, JUDGE:

In unlawful entry and detainer the court below set aside the verdict for defendant and awarded plaintiff a new trial, to which judgment we awarded a writ of error.

In disposing of this case we have had in mind the general rule that a stronger case is required to justify an appellate court in disturbing an order granting a new trial, than when one has been refused, and that the judgment below will not be reversed, unless plainly erroneous. 10 Ency. Dig. Va. & W. Va. Repts. 471; *Coalmer* v. *Barrett,* 61 W. Va. 237, 244.

The first point is that plaintiffs' evidence was so variant from the facts alleged that the verdict could not have been otherwise than for defendants. It is argued that section 1, chapter 89, Code 1906, gives three separate and distinct causes of action, each requiring specific allegation and proof, namely, forcible entry, unlawful entry, and unlawful detainer. The statute, however, prescribes but one form of summons (declaration), namely, that it summon "defendant to answer the complaint of the plaintiff, that the defendant is in the possession and unlawfully withholds from the plaintiff the premises in question." The form of summons in this case is the same as that prescribed by Mr. Minor, 4 Minor 629; and by Mr. Hogg, Hogg's Pl. and Forms, 412. It is contended that plaintiffs' evidence of forcible entry by defendants, not alleged in the summons, was not admissible. The point is without merit. Such evidence is admissible in an action of unlawful entry and detainer. Every forcible entry is unlawful, regardless of the right to the possession, and evidence thereof will support the action. *Duff* v. *Good,* 24 W. Va. 682; *Olinger* v. *Shepherd,* 12 Grat. 462; *Feder* v. *Hager,* 64 W. Va. 452. Evidence of good title and right to the possession is also admissible whether defendants' possession was obtained peaceably or forcibly. *Olinger* v. *Shepherd* and *Feder* v. *Hager, supra.* Plaintiffs relied not only on their evidence of forcible entry by deendants, but also upon good and paramount title. They offered title papers which they claim took them back by an unbroken chain to the Commonwealth.

On the theory of forcible entry by them defendants claim plaintiffs' evidence was insufficient to support a verdict for them. The evidence in chief mainly relied on by plaintiffs was that of their tenant W. G. Beavers, and Crockett Beavers his brother. And as corroborating them they also relied on the testimony of Thomas Harman and Frank Harman, two of the defendants, not controverted they say by the evidence of John Estill Harman, the other defendant, who also testified, but who said

nothing on the subject; also on the fact that William Brewster, son-in-law of John Estill Harman, present at the time, was not called or examined by defendants. Defendants contend, however, that the evidence being conflicting plaintiffs are concluded by the adverse verdict of the jury. They also claim that being themselves in possession of the land, of which the 107¾ acres is a part, the entry thereon by plaintiffs constituted a mere trespass, against which they had the right to protect themselves, by force if necessary. Plaintiffs claim that the witnesses on both sides substantially agree on what occurred after their entry on the land, and that the facts established by the decided weight, and preponderance of the evidence present a question of law for the court. In such cases the court does not invade the province of the jury in pronouncing judgment on these facts. *Shoe Co. v. Prince,* 51 W. Va. 510, 515.

It is not controverted that the Beavers under a lease in writing from plaintiffs to W. G. Beavers, about March, 1903, entered upon the 107¾ acres of land in controversy, pitched their tent, and remained there for several days felling trees and clearing away the brush, preparatory to building a cabin on the land; that while they were so engaged defendant John Estill Harman, with his two sons, Thomas and Frank, and his son-in-law, William Brewster, the sons and son-in-law being armed either with a shot gun or rifle, went upon the land where the Beavers were at work, and that John Estill Harman, after inquiring of the Beavers, what they were doing there, and who had put them there, and by what right, and being told, and probably shown the contract of lease, he endeavored to serve written notice on W. G. Beavers, which Beavers says he didn't notice, dropped it. Beavers also says that Harman also warned him verbally that if he did not get out by the next day "there would be shooting going on"; that Harman did not distinctly say that he would shoot, and that the boys did not say they would shoot, but that because of what they did say he was afraid they would shoot him, and that he pulled out that same night, about 8 o'clock, and went to Cane Break to see Taylor, plaintiffs' agent, and to report to him what had occurred. He also says that his brother, who had gone for a saw before the Harmans arrived on the land, had not returned before he left. On the following Monday morning Beaver and his brother went back, found

Harman, his sons, son-in-law and Tom Lambert and others on
the land; that they had torn down his tent, and were engaged
in building fence and hauling the logs which he and his brother
had cut for the cabin, and that John Estill Harman had a shot
gun.   In the conversation between the Beavers and Harman that
morning they say Harman tried to get W. G. Beavers to sur-
render his lease, and to take employment under him, which,
Beavers says, he declined, and that in about a half hour they
went away fearing to attempt to regain possession of the land.
Defendants completed the cabin begun by the Beavers, out of
the logs prepared by them and put in it one of their own men
to hold possession.   It is admitted by the Harmans that J. E.
Harman ordered the Beavers to get off the land and notified
them that they would have to get off.   They admit also that
they went on the grounds with their guns.   But in explanation,
Thomas Harman says he had been sick and that he used his
gun as a cane.   Frank Harman says on cross-examination that
he had his gun because his father was going to serve notice on
the Beavers to vacate.

Moreover, J. E. Harman claims he had the right to defend
his alleged possession by force if necessary.   His title consists:
First, of a deed from H. M. Harman to John Estill Harman,
August 24th, 1876, by rather indefinite boundaries calling for
100 acres more or less, but surveyed in this suit, according to
directions given by him, covering a boundary of 634 acres,
including most of the 107¾ acres in controversy; second, con-
tinued possession under Rebecca Brewster, his mother-in-law,
his wife being her only heir, and the said Rebecca Brewster
being also a daughter and one of the devisees of Mathias Harman,
who had owned, or claimed and resided on a tract of 250 acres,
of which the 107¾ acres in controversy is a part, for about 45
years, and the improvements on which are from 75 to 100 years
old.   The evidence shows that notwithstanding his claim by
the deed from his brother in 1876, J. E. Harman, October
30th, 1889, purchased and procured from D. G. Sayers and
wife a deed for a tract described as containing 200 acres more
or less, and within the boundary of the 634 acres as claimed by
him, and on which his dwelling house and other improvements
were located.   This tract of 200 acres, March 23rd, 1899, he
sold and conveyed to W. M. Ritter, describing it by metes and

bounds as the Harman home place, and as containing 154.05 acres more or less, and as being the same land, or a portion thereof, conveyed to him by D. G. Sayers and wife, October 30th, 1889, and as beginning at a corner to Patterson and McMillin's 380 acre tract, and Mathias Harman's 250 acre tract, making no reference therein to his deed of 1876. It also appears that the 200 acre tract and the 250 acre tract are both within a 50,000 acre tract, part of a 300,000 acre tract patented to Wilson Cary Nicholas in 1795; and that Mathias Harman, though claiming his land by prior patents, on April 10th, 1884, five years before J. E. Harman procured his deed for the 200 acres, also procured a deed from said Sayers for 250 acres. So that if J. E. Harman claimed under his prior deed of 1876, Mathias Harman, his father-in-law and neighbor was also in possession claiming under prior patents, and after getting his deed from Sayers in 1884 he and his heirs and assigns, as for many years before, continued in possession of his 250 acre tract. Mathias Harman devised his land in part, at least, to children and grand children, the tract in controversy, which plaintiffs claim, going to his grand daughter Josephine Harman, and twenty nine acres thereof, perhaps a part of the tract on which defendant, J. E. Harman moved after selling his land, going to his mother-in-law, Rebecca Brewster, for life, remainder to Mathias Harman, son of Daniel Harman, and two other parts going to other children. A deed in evidence, dated July 26th, 1884, purporting to be "between the undersigned heirs at law of Mathias Harman, deceased, and signed by William Harman, Christena Harman, Rebecca Brewster, Daniel Harman and Nancy Wallace, purports to convey to Christena Harman a certain boundary of land on John's Branch, and bounded on one side by the division line between J. E. Harman and Mathias Harman; and to said Rebecca Brewster a tract described as: "Beginning on said Christena Harman's line, on John's Branch, at the forks of said branch, running to Estell Harman's lines, Patterson, McMillins and others, and so as to include all the land on John's Branch owned by said Mathias Harman, deceased, at the time of his death, and not heretofore conveyed by deed or will, and also all the lands on the South or West side of Dry Fork, not heretofore conveyed by deed or will, by said Harman, deceased, to Daniel Harman." Bailey, surveyor, says,

this description covers 147 acres, part of the 250 acres, and designated on the official map as Hannah Harman's 147 acres, and the same on which J. E. Harman, under Rebecca Brewster, resided at the time of his death. He further says he never knew of J. E. Harman having possession of any part of the 250 acre tract, except the 147 acres owned by his wife and on which he moved after he sold to Ritter. One witness, W. P. Payne, thought Mathias Harman had been dead since 1883. And it is argued from this that Mathias Harman could not have been living in April, 1884, the date of the deed from D. G. Sayer to him for the 250 acres, rendering that deed void. It is very certain, however, that the witness Payne is at fault in his recollection, for Mathias Harman's will, dated May 10th, 1883, was not probated until April 26th, 1885, and J. E. Harman himself substantially admits knowledge of Mathias Harman's purchase and deed from Sayers, and that he claimed it as his old patent land, and says that if the 250 acre-tract was not covered by his old patents, it was covered by the land he bought of Sayers. He further admits that he himself bought from Sayers for the reason that if the Sayers land ran as he claimed, Sayers' title was better than his. He pretended to think and expressed the opinion that Sayers was mistaken, and that his deed did not take in as much as he claimed. He does not attempt to show, however, how much of the land claimed by him was outside of the Sayers claim, nor where located.

Though J. E. Harman claimed that his deed of 1876 covered the 250 acres belonging to Mathias Harman, he never had any actual possession of any part of this tract until he went in under Rebecca Brewster. He and Mathias Harman lived neighbors for years, and it is not shown, and is most improbable, that during the life of Mathias Harman, or after his death, J. E. Harman acquired any title by possession as against Mathias Harman, his heirs or devisees. Mathias Harman's title was older than J. E. Harman's deed of 1876, and the latter had nothing to stand on. Sayers' title was conceded by J. E. Harman to be older and better than his deed of 1876. Mathias Harman's deed from Sayers is older than J. E. Harman's by five years. His possession within the interlock appears from the evidence to have been actual, open, continuous and adverse to all others, including J. E. Harman. We do not see from the record how

J. E. Harman now actually occupying part of the land so acquired by Mathias Harman, under Rebecca Brewster, his mother-in-law, ever acquired any title to the land claimed by plaintiffs, either under his deed of 1876, or his deed from Sayers of 1889. He could with as much show of right have claimed title by possession under his deed of 1876 to the land of his mother-in-law Rebecca Brewster on which at the time of this suit and at the time of his death he was living, not in hostility, but in subordination to the title of Mathias Harman, for it was a part of the 250 acres covered by the deed to Mathias Harman of 1884. There is no appreciable evidence showing that he at any time during the life of the latter, except by the mere recording of his blanket deed of 1876, claimed any part of the 250 acres, or in hostility to the title of Mathias Harman. He is shown by his acts in assisting in the making of surveys of this and adjoining lands, and by the recitals in his deed to Ritter, to have recognized the superior right and title of Mathias Harman, his heirs and devisees, and there is no room to doubt that at the time of his death he was living upon that portion of this land so acquired by his mother-in-law in subordination to that title. Having thus obtained possession of so much he, or those claiming under him, now seek to hold the portion devised to Josephine Harman, the land in controversy, under his blanket deed of 1876, and alleged possession under it. There is nothing in the record as now presented to justify the claim. We can say, therefore, unhesitatingly, that J. E. Harman never had or acquired any such right to or possession of the land in controversy as at the time he entered and took possession from plaintiffs he had the right to maintain by force.

Are plaintiffs then entitled to maintain this action against defendants? If defendants' entry was forcible, it was unlawful, regardless of the question of right. If they were strangers, or without right or title, their entry was unlawful whether forcible or not. *Duff* v. *Good, supra; Franklin* v. *Geho,* 30 W. Va. 27; *Davis* v. *Mayo,* 82 Va. 97; *Fore* v. *Campbell, Id.* 808; *Olinger* v. *Shepherd, supra.*

In *Franklin* v. *Geho* it is said: "A forcible entry, for which under our statute, as under the statute of other states, the party dispossessed is given civil redress by this summary proceeding, is precisely the same as the forcible entry, for which at common

law an indictment would lie." And adopting the rule for determining what constitutes such forcible entry, stated in *State* v. *Pollock,* 4 Ired. Law (26 N. C.) 305, one of the cases cited, it is held, point 2 of the syllabus: "Where a party, entering on land in possession of another, either by his behavior or speech, gives those, who are in possession, just cause to fear, that he will do them some bodily harm if they do not give way to him, his entry is esteemed forcible, whether he caused the terror, by carrying with him such unusual number of attendants, or by arming himself in such a manner, as plainly to indicate a design to back his pretentions by force, or by actually threatening to kill, maim or beat those, who continue in possession, or by making use of expressions, plainly implying a purpose of using force against those who make resistance." See also 19 Cyc. 1112-1117. The difficulty we encounter here, like that encountered by the Court in *Franklin* v. *Geho,* is in applying this law to the facts. The facts here are not unlike the facts in that case. In that case the hostile demonstrations consisted mainly in the tearing down by defendant, in the absence of plaintiff, of a line fence recently rebuilt by the latter, and moving it over on the land, which plaintiffs had had in actual use and possession for more than twenty years; the rebuilding thereof by plaintiff on the old line; the tearing down and removing of the fence again by defendant; a second rebuilding thereof by plaintiff on the old line; tearing it down again and removing it to the new location by defendant; and lastly in threats by defendant to whip the plaintiff and his whole family if they should further interfere with the fence as relocated by him. There was some conflict in the evidence as to what was the exact language of the defendant's threats. The plaintiff desisted, however, and brought his suit of unlawful entry and detainer. The Court, by Judge GREEN, in that case says: "The evidence is certainly to some extent unsatisfactory, and contradictory; but giving it a most benign interpretation, as the court must have done on this motion to exclude the evidence of the plaintiff, and more especially as he never did again pull down this fence, as he had done twice before in a month's time, but instead of doing so brought this suit, we must conclude, that the plaintiff was driven from the possession of this land by the threats of the defendant, that he would beat him; and this constituted the entry on this

land by the defendant a forcible entry." In that case no deadly weapons were exhibited. In this there were. The defendant went upon the ground with numbers all armed except himself, made his demands, and was at least prepared to enforce them. When he went back on the following Monday morning he took with him unusual numbers and his gun, entered, tore down the tent of plaintiffs' tenants, fenced in the land occupied by them, and was prepared to maintain his position. What did these demonstrations all mean? Some of the authorities cited say: "This terror may be caused by the party carrying with him such an unusual number of attendants or by arming himself in such a manner as plainly to intimate his design to back his pretentions by force." The same authority says: "There may be a forcible detainer, although the entry is peaceable; but whoever retains a wrongful possession by keeping an unusual number of people or unusual weapons or threatening to do some bodily hurt to the former possessor if he dares to return is guilty of a forcible detainer, although no attempt is made to re-enter." 19 Cyc. 1116. These authorities with others that might be cited, we think, upon the undisputed facts, and upon defendants' admissions, pronounce them guilty not only of forcible and unlawful entry, but of forcible and unlawful detainer, justifying the judgment of the court below in setting aside the verdict for defendants and awarding plaintiffs a new trial.

The conclusion reached on the question of the forcible entry and detainer calls for affirmance of the judgment below; and seeing, as we do from the facts proven, that defendants, on the new trial awarded, will be unable to make a different case on the question of unlawful entry and detainer, it becomes unnecessary for us to go into the question of the relative strength of the conflicting claims of title, or the many questions raised upon the admission and rejection of title papers and oral evidence in relation thereto.

We therefore affirm the judgment and remand the case for a new trial in accordance therewith.

*Affirmed.*